422 So.2d 444 (1982)
SUCCESSION OF Regina DUBOS.
No. 12945.
Court of Appeal of Louisiana, Fourth Circuit.
September 30, 1982.
Rehearing Denied December 21, 1982.
Marianne N. Koorie, Koorie & Loup, James J. Grevemberg, New Orleans, for defendant-appellee.
Arnold C. Jacobs, New Orleans, for plaintiff-appellee.
*445 Before REDMANN, AUGUSTINE and LOBRANO, JJ.
AUGUSTINE, Judge.
This case is before us to review a single question of fact: whether the trial court committed manifest error in finding that on May 31, 1976, Regina Dubos possessed sufficient capacity to perfect her last will and testament.
The testatrix, Regina Dubos, died on March 5,1980 at the age of eighty-nine. A few years earlier, on January 29, 1976, Miss Dubos executed a statutory will, thus disposing of her estate which, by that time, had grown to considerable size. Included among the numerous legatees were Mr. and Mrs. Albert J. Turegano, who together received, among other things, five separate immovable properties in the City of New Orleans, three of which were on St. Charles Avenue. The Tureganos also received 1,920 shares of American Smelting and Refining Company stock and 336 shares of Standard Oil of California.
Other dispositions of immovable property were made to Dr. and Mrs. Robert G. Miller, who also received a number of properties on St. Charles Avenue and at other locations in the Carrollton section of the city. The will named Dr. Miller as executor of the decedent's estate.
Four months after making the first will, Miss Dubos executed a second testament, which purported to revoke the first. Written in long hand by her attorney, the act reads:[1]
 Jefferson Parish, LA
 May 31, 1976
I, Regina Dubos, make this my last will and testament.
I revoke any and all prior wills and powers of attorney.
I name and appoint Felix W. Gaudin and James J. Grevemberg as attorneys to handle the affairs of my estate.
In witness whereof, I have signed this my last will in the presence of the witnesses hereinafter named and undersigned.
 (Signed) Regina Dubos
This act was witnessed by Marion W. Arnaud and Mrs. Louise J. Dubos and was notarized by William J. Luscy, 111, Notary Public.
Following Miss Dubos' death almost four years later, Dr. Miller probated the first will (that of January 1976) and was appointed executor. Regina Dubos' second testament was probated a week later, on March 27, 1980. That same day, Louis R. Arnaud, the decedent's closest relative and presumptive heir, filed a petition to nullify the first will. Dr. Miller answered the petition and, in return, attacked the second will, alleging that at the time it was made, Miss Dubos was lacking in testamentary capacity.
After trial on the merits, the trial court rendered a judgment annulling the first will and recognizing the second. Dr. Miller was removed as executor. This appeal followed.
Dr. Miller and other legatees of the first will sought to establish that at the time of the second will, the decedent was lacking in capacity in two respects: first, in that the testatrix was incapable of forming a donative intent, and second, in that Regina Dubos had lost the ability to read, due to her failing eyesight. The second incapacity, if proved, would render the testament fatally defective for failure to conform with La. R.S. 9:2442, which requires (for the form of will provided by that statute) that the testator be physically able to read, and La.R.S. 9:2443, which provides that where the testator cannot read, the will shall be read aloud by the notary in the presence of the testator and three witnesses.
The plaintiff's allegations require the application of several principles which guide review by an appellate court. Primarily, we note that testamentary capacity is solely a question of fact to be determined by the trial court. Therefore, we will not disturb the trial court's findings on that issue in the absence of manifest error. *446 Brown v. Dunbar, 375 So.2d 148 (La.App. 2d Cir.1979), writ den. 377 So.2d 118 (La.1980); Succession of Smith, 261 So.2d 679 (La.App. 2d Cir.1972). Moreover, with regard to that which plaintiff sought to prove at trial, (that is, lack of testamentary capacity), the burden of proof is significant, being the same as that which must be borne by the prosecution in a criminal case: the party attacking the will on the basis of the testator's incapacity must prove beyond a reasonable doubt that at the time the will was made, the testator did not have sufficient knowledge and understanding of the effect of his action. Succ. of Collins v. Hebert, 377 So.2d 516 (La.App. 3rd Cir.1979), writ ref. 399 So.2d 15 (La.1980), Succ. of Brown, 251 So.2d 465 (La.App. 1st Cir.1971). Stated another way, there exists a very strong presumption (much like the presumption of an accused's innocence), that the testator possessed the requisite testamentary capacity. Succ. of Zinsel, 360 So.2d 587 (La.App. 4th Cir.1978); Succ. of Arnold, 375 So.2d 157 (La.App. 2d Cir.1979). We note, also, that a testator's ability to read is considered by our jurisprudence as an element of capacity, and therefore the party alleging the lack of that capacity assumes the same burden as that which attaches to proof of mental incapacity. Succ. of Littleton, 391 So.2d 944 (La.App. 2d Cir.1980); Succ. of Arnold, supra, Succ. of Glynn, 167 So.2d 533 (La. App. 4th Cir.1964).
It is undisputed that throughout most of her life, Regina Dubos had been blessed with good health, a quick intelligence, and perfect eyesight. Shortly after making the will of January 1976, however, Miss Dubos fell and fractured her hip. As is often the case with the elderlyMiss Dubos was eighty-five years of age at that timeshe developed pneumonia. She was admitted to East Jefferson Hospital on April 26, 1976, slightly more than a month before the making of the second testament.
The plaintiff, Dr. Miller, sought to prove that from the time of her admission to East Jefferson Hospital until several months afterward, Regina Dubos was so disoriented and confused that she did not possess sufficient mental capacity to make a valid testament. Dr. Miller stated that during his frequent visits to the testatrix at the hospital, he observed that Miss Dubos was seemingly unable to comprehend either who she was or where she was, and was unable to respond appropriately to her new environment. He explained that her condition was the result of hardening of the arteries, which reduced the supply of oxygenated blood to the brain. He noted that throughout her stay at the hospital, the decedent remained near comatose and required extensive medication consisting of intravenous infusion, antibiotics, diuretics and cardiac drugs such as digitalis. Dr. Miller further stated that after Miss Dubos was released from the hospital and admitted to Colonial Oaks Nursing Home on May 19, 1976, although her physical condition seemed to improve, her mental capacity did not. He characterized the decedent's condition as "cerebral insufficiency," marked by confusion as to time, place and even her own identity. This incapacity, the doctor said, persisted until September or October of 1976, at which time Miss Dubos began to steadily improve. With regard to Miss Dubos' eyesight, the doctor testified that throughout the many years that he had known Miss Dubos (he was her close friend and private physician[2]), she had always been an avid reader, at least until 1974 or 1975, when she developed cataracts. After that time, he said, Miss Dubos could read only with the aid of a magnifying glass. According to Dr. Miller, Miss Dubos' sight finally deteriorated to the point that while she was in the hospital, and later, in the nursing home, she could not even recognize visitors and friends whom she had known for many years.
The plaintiffs corroborated the testimony of Dr. Miller with that of Mrs. Josie Turegano and Robert J. Miller, Jr., both of whom had established a close familial relationship *447 with Miss Dubos. These witnesses confirmed that Regina Dubos was an insatiable reader until late in life, but that by the time she executed the revocatory will, her vision had so deteriorated that she relied upon others to read to her. Robert Miller, Jr. testified, as his father did, that Miss Dubos frequently seemed confused, sometimes speaking of her parents as though they were still alive.
The Director of Social Services at Colonial Oaks, Audrey Vallon, was one of the decedent's daily visitors. In Miss Vallon's opinion, Regina Dubos was lacking in "reality orientation", as she put itwithdrawn, difficult to communicate with and apparently unable to sustain a train of thought in extended conversation. She also noted that, unlike most other convalescents, Miss Dubos failed to form friendly relationships with her or any of the nurses. With regard to the decedent's vision, the director said that Miss Dubos had confessed her own inability to see, thereafter relying upon Miss Vallon to read the mail to her.
Finally, the plaintiffs presented the medical records of Miss Dubos' treatment at East Jefferson Hospital. The discharge summary, prepared by Dr. A.M. Scardino, reveals that upon admission, March 26, 1976, Miss Dubos was suffering from pneumonia and arterioscleratic cerebrovascular disease. She was described at that time as confused, lacking in responsiveness and on the verge of coma.
Plaintiffs emphasized Miss Dubos' lack of comprehension throughout her three-week stay at the hospital and even after discharge to Colonial Oaks. The hospital record fails to support these allegations, however. While there is no doubt that during the first days of her hospitalization, Miss Dubos was confused and disorientedshe was, after all, near coma and under heavy medicationas of the beginning of May, 1976, Miss Dubos began to show definite, steady progress. On almost every occasion thereafter, the nurses' notes describe her as: "awakeappears to understand when spoken to"; "alert, appears oriented"; "alert and responsive"; "responds coherently"; "answers questions coherently"; "appears alert, cheerful", and so on.
In light of the hospital record, we shall now briefly review the testimony of several witnesses who testified on behalf of the proponents of the second will. Each of the several witnesses to the last will and testament of Regina Dubos testified that at the time the second will was executed, the testatrix appeared to be of sound mind and to comprehend the significance and effect of her act.
Mrs. Louis Arnaud described Regina Dubos as having been very cheerful, alert and lucid at the time of the execution of the second will. She recalled that the majority of Miss Dubos' conversation with her attorney was in French, and that after the will was written by her lawyer, Mr. Felix Gaudin, Miss Dubos read the will herself and signed it in her own hand without assistance.
Mrs. Alice Dubos, a long-time friend of the decedent (related by marriage), contended that while convalescing at the nursing home, although Miss Dubos had occasional lapses of concentration, she normally greeted visitors cheerfully and engaged in conversation. She corroborated Mrs. Arnaud's testimony, expressing her certainty that Regina Dubos had read the second will before signing it.
William J. Luscy, Notary Public, testified that Miss Dubos acknowledged and signed the will on both pages. He stated, further, that he perceived no physical or mental incapacities in the testatrix, and that if he had, he would not have notarized the will. Mr. Luscy identified the will, containing his signature and that of Regina Dubos, then directed the court's attention to her signature, which closely followed the printed line, indicating that her vision was not so impaired as to prevent her from reading the testament.
The proponents of the second will called two other significant witnesses, Helen Brazilian and Thelma Bridges, both of whom had daily contact with Miss Dubos, having been employed as "sitters". Both of these witnesses testified that Regina Dubos appeared to have the ability to see.

*448 CONCLUSION
We find no manifest error in the trial court's finding that the plaintiffs had not proved the decedent's lack of capacity beyond a reasonable doubt. The ultimate factual issue was resolved by the trial judge's evaluation of the witnesses' credibility, and with that resolution we do not argue. We note that, concerning the decedent's mental capacity, the plaintiff's case was simply not borne out by the medical record, which upon review, utterly refutes the allegation that Miss Dubos was habitually confused and disoriented. Evidently, the trial court was also impressed, as we are, with the fact that although Dr. Miller strenuously denied Regina Dubos' ability to comprehend her act of May 31, 1976, he was equally certain that her capacity to donate and sell certain valuable properties to him during her later years was not similarly impaired. As to whether Miss Dubos could see well enough to read, we note that the plaintiff's own witness, Mrs. Turegano, contradicted the doctor and his son when she stated that on every occasion, Regina Dubos recognized her (and other visitors) and greeted her warmly.
We cannot find fault with the trial court in assigning great weight to the testimony of the witnesses of the May 31 testament, for the testatrix's capacity on that date is, of course, critical. The testimony of the notary, in particular, has always been regarded as carrying special credence in any dispute as to testamentary capacity, and we see no reason to diverge from that path here. See Chandler v. Barrett, 21 L.Ann. 58, 99 Am.Dec. 701 (1869); Succ. of Bey, 46 La.Ann. 787, 15 So. 297 (1894); Succ. of Crouzeilles, 106 La. 442, 31 So. 64 (1901). The unequivocal testimony of each of the witnesses to the testament provided the factual basis for the trial court's conclusion that the decedent did possess the physical and mental capacity to fully understand the import and effect of her act. Conversely, we note that none of the plaintiff's witnesses was present at the confection of the second testament, and therefore could refute the evidence of testator's mental capacity, if at all, only by resort to circumstantial evidence of her condition before and after the making of the second testament. Upon the record as a whole, we agree with the trial court that the plaintiff's evidence was insufficient to prove beyond a reasonable doubt that Regina Dubos lacked testamentary capacity. Accordingly, we find no manifest error in the proceedings below. The judgment is affirmed.
AFFIRMED.
NOTES
[1] On the next page, the act contained the requisite formal recitations. La.R.S. 9:2442.
[2] Dr. Miller is married to the daughter of Mr. and Mrs. Albert Turegano, who lived with the deceased for many years.