11 YELVERTON, J.
The trial judge annulled Willie McClin-ton’s last will and testament. The testament was executed by use of the formali *907 ties prescribed for the statutory will of La.R.S. 9:2442. Subsection A of that statute provides that a statutory will may be executed under that Subsection only by a person who knows how to sign his name and knows how to and is physically able to read. Another statute, La.R.S. 9:2443, prescribes the formalities for a person whose sight is impaired to the extent that he cannot read, or who does not know how to read and whether or not the person is able to sign. The trial judge annulled the will on the petition of the deceased’s widow and one of his sons, finding, after a trial presenting a number of witnesses, that the 91-tyear-old2 deceased was not able to read. Finding no manifest error in this factual and credibility determination, we affirm.
The will was dated October 8,1996. Mr. McClinton died five weeks later on November 12,1996. The suit to annul his will was filed on December 12, 1996, one month after his death. The will had not been filed for probate.
Mr. McClinton and his wife of seventy years, Rosene McClinton, had been separated for six or seven years prior to his death. Their marriage produced twelve children. At the time of Mr. McClinton’s death, nine children were still living. The will bequeathed to two of them, Henrie Doris McClinton Smith and Harold McClinton, a one-half interest in indivisión in all of the property he possessed. These two persons were named the defendants in the action of nullity. They appealed the judgment of the trial court.
Their primary assignment of error is that the trial judge was manifestly wrong in determining that Mr. McClinton did not know how to read. Louisiana Revised Statute 9:2442 requires that the testator must be physically able to read at the time the testament is executed. Succession of Young, 96-1206 (La.App. 3 Cir. 3/5/97); 692 So.2d 1149. A testator’s ability to read is an element of testamentary capacity. Succession of Fletcher, 94-1426 (La.App. 3 Cir. 4/5/95); 653 So.2d 119, writ denied, 95-1105 (La.6/16/95); 655 So.2d 338. The question of whether a testator can read is a question of fact. Therefore, the trial court’s ruling on that issue cannot be overturned unless it is clearly wrong and manifestly erroneous. Id.
The meaningful evidence was limited to the testimony of family members. Four family members testified that Mr. McClinton could not read. The |3strongest testimony came from 89-year-old Mrs. McClinton who was married to Mr. McClinton from 1921 until his death. She testified without equivocation that he could not read. She said that she had to read papers and the Bible to him as well as the prescriptions on his medicine bottles. They did not take a newspaper at the house, but he would look at grocery ads in the advertising supplement of the Natchi-toches paper. She stated that her husband had no schooling. Further, she testified that Mr. McClinton got letters from his brother, which were read to him, but he could not write back to his brother. It was not a physical problem that kept him from reading. “He didn’t know how to.” Although he could count money, he never voted, never served in the military, and never had a bank account. The trial judge, in excellent written reasons for judgment, found her testimony “most persuasive.”
Vernon McClinton testified that his father could not read and that other family members read his mail for him. When Vernon quit school in the seventh grade, his father wanted him to stay in school, giving himself as an example of one who could not read because he never went to school. Mary Lee McClinton, one of Mr. McClinton’s daughters, testified that she never saw her father read and that she often read his mail for him. Cedric McClinton, who was Mary Lee’s son and a college graduate, also testified that he had, on several occasions, read and explained important papers to his grandfather. He had never seen his grandfather read.
*908 Three of Mr. McClinton’s children testified that he could read. Henrie Doris, one of the legatees, testified that she had seen her father reading the paper for groceries and reading his bills. She admitted that her father had never read out loud to her. Harold, who was the other legatee, and Abraham McClinton testified that they |4saw their father reading the paper and the Bible. Notably, only Abraham stated that his father read out loud and that was decades earlier when Abraham was a child. Henrie Doris and Harold also stated that their father received and responded to letters from his brother.
The deposition testimony of Betty Skinner, notary of Mr. McClinton’s will, and Karen Womack, a witness, was of no help in resolving the issue. They stated merely that neither knew whether Mr. McClinton could read or not, because they did not ask him. Ms. Skinner testified that she read the will to Mr. McClinton, he told her that ■ was what he wanted, and he then signed it. Ms. Womack recalled that Ms. Skinner read the will to Mr. McClinton. Neither woman testified that Mr. McClinton read the will himself.
Mr. McClinton lived in Natchitoches but the will was done in Many, Louisiana. Neither woman had ever met Mr. McClin-ton before the will was executed.
The entire case is based on testimony. The documentary evidence that was introduced proved nothing. Documentary evidence was introduced by both sides. The documentary evidence produced by the defendants consisted of a driver’s license and a food stamp card both bearing his signature. The fact that he had a driver’s license is not evidence for or against his ability to read. Louisiana Revised Statute 32:408(A)(2) provides that the knowledge test which applicants for driver’s licenses must pass “may be given in oral, written, or automated form.” There was no evidence how this test was administered to Mr. McClinton. The food stamp card similarly does not establish that he could read, only that he knew how to sign his name. The certification of the Natchitoches Parish School System, introduced by the plaintiffs, jgthat there was no record of his having attended school in that parish, where he lived all of his life, is likewise of little relevance. There are many self-taught people in this world.
All testimony established that Mr. McClinton was a successful businessman capable of handling money and making calculations. However, as noted by the trial court, no physical evidence of any writing composed by Mr. McClinton during his ninety-one years of life was introduced at trial which would indicate that he had the ability to read and write. On the basis of all of the evidence, the trial court found that the proof was clear and convincing that the deceased was lacking in testamentary capacity to make this type of will: he could not read. We agree.
In another assignment of error, appellants claim that the trial court was wrong to apply the clear and convincing burden of proof in determining whether Rosene and Vernon McClinton proved that Willie lacked the ability to read. Relying on the third circuit case of Succession of McKay v. Mount, 449 So.2d 189 (La.App. 3 Cir.1984), appellants argue that the correct standard to apply is beyond a reasonable doubt. However, after the McKay decision, the standard of proof for a party to meet when claiming lack of testamentary capacity has changed. Today, the correct burden of proof in order to rebut the presumption of testamentary capacity is clear and convincing evidence. Succession of Lyons, 452 So.2d 1161 (La.1984); Succession of Young, 692 So.2d 1149.
In their third assignment of error, appellants argue that the trial court should have given more credence to the positive testimony of Henrie Doris and Harold that Mr. McClinton could read, than the negative testimony of Rosene and | fiVernon that he could not read. For this proposition, appellants cite Estate of Moreau v. Mor- *909 eau, 261 So.2d 293 (La.App. 3 Cir.), writ denied, 262 La. 193, 262 So.2d 789 (1972).
Evidence that a person knows or does not know how to read is hard to categorize as positive or negative. However, using the terminology, we note that in Moreau there was strong positive evidence presented to the court which established that the testatrix could read at the time she executed her testament. The issue was not whether she knew how to read but whether she was physically able to read as it was contended that she was blind. An ophthalmologist, who examined the testatrix immediately prior to the date of execution of her will, testified that with the aid of a monocular device, the testatrix could read type-written material. There was other testimony that the deceased possessed a magnifying glass to enable her to read. Even the opponent of the statutory will, the deceased’s own husband, admitted that his wife could read with the help of a magnifying glass. It was clear in the Mor-eau case that the positive testimony that the deceased knew how to read, but had difficulty physically reading without the help of a magnifying glass, deserved more credence than the negative testimony of those who were not often in contact with the deceased.
In the instant case, however, there was little positive testimony presented by the defendants’ witnesses, Henrie Doris, Harold, and Abraham. Only Abraham said he remembered that his father, fifty years earlier, had read the Bible out loud at the kitchen table. Abraham’s remaining testimony obviously carried little weight with the trial judge: Abraham’s reasons for believing his father could read were because his father could make up a bale of cotton on a wagon, had credit accounts, could drive a car, and was a deacon in his church.
17Great deference is demanded to findings based on determinations regarding the credibility of witnesses. Rosell v. ESCO, 549 So.2d 840 (La.1989); Succession of Young, 692 So.2d 1149. This case is clearly a credibility determination by the trial court.
Appellants’ next assignment is based upon the rule that testamentary capacity to make a will is tested at the time the will is made. Naquin v. Hile, 536 So.2d 676 (La.App. 3 Cir.1988). Appellants’ argument is that the trial court should have recognized that their testimony-that the deceased could read at the time the will was executed-was uncontroverted and therefore presumed true. They say it was uncontroverted because none of the plaintiffs’ witnesses had been around him during the last six or seven years of his life. Contrary to appellants’ assertions, Vernon, Mary Lee, and Cedric McClinton, who testified that their father and grandfather could not read, were not isolated from him in the last six or seven years of his life. Only his wife was. The others were in regular contact with him up until a few months before his death. Mary Lee took him food three days a week.
Nevertheless, the proponents of the will suggest that the presumption of testamentary capacity prevails because, in his last six or seven years, the deceased lived alone, and he could have acquired the ability to read unbeknownst to his wife and the others. Although conceivable as a possibility, this theory is most unlikely, and it is unsupported by any proof. The proof in the record convincingly rebutted the presumption of testamentary capacity by showing that he did not know how to read for the first 84 or 85 years of his life, and the presumption is not revived by the minuscule chance that he acquired the ability to read in his final years.
|8In oral arguments in this case, the question was raised at what level of reading should we consider a person literate and therefore capable of executing a statutory will under La.R.S. 9:2442. The testimony showed Mr. McClinton was able to decipher numbers and highway signs, and identify prices in grocery ads in newspapers. He could count money and operated *910 a small business, the Silver Top Café. Other courts have held that evidence that one could understand and utilize numbers and symbols does not classify him as literate by any standard. Succession of Comeaux, 428 So.2d 1081 (La.App. 1 Cir. 1983); Atkins v. Roberts, 561 So.2d 837 (La.App. 2 Cir.1990). A person cannot read, in the sense meant by this statute, if he cannot examine and grasp the meaning of written or printed words and sentences. Here, we do not reach the question of what level of reading should be considered ability to read, because the factual finding that we affirm is that Mr. McClinton could not read at all.
For the foregoing reasons, the judgment of the trial court is affirmed at appellants’ costs.
AFFIRMED.