479 So.2d 446 (1985)
Peggy Ann BROUSSEAU
v.
Robert W. TUCKER, et al.
No. CA-84-0914.
Court of Appeal of Louisiana, First Circuit.
November 19, 1985.
*448 Robert D. Downing, Baton Rouge, for plaintiff-appellant Peggy Ann Brousseau.
James H. Morgan, Kenneth E. Barnette, Baton Rouge, for defendant-appellee National Union Fire Ins. Co.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
LANIER, Judge.
This is a suit for damages in tort arising out of an automobile accident. After a trial, judgment was rendered against the insurer[1] for $6,303.63 with legal interest and costs. The plaintiff filed a motion for a new trial to introduce alleged newly discovered evidence and for a reconsideration of the damage award. After a hearing, the motion for a new trial was denied. Plaintiff then took this devolutive appeal. The insurer has not appealed or answered the appeal.[2]

FACTS
On Friday, September 5, 1980, at approximately 8:30 p.m., Peggy Ann Brousseau was operating her 1977 Dodge Aspen in the center lane on the westbound three lanes of Interstate 10 near the College Drive exit in East Baton Rouge Parish, Louisiana, when her vehicle was struck by an 18 wheel tractor-trailer owned by Long Mile Rubber Company (Long Mile) and being driven by its employee, Robert W. Tucker. Long Mile was a subsidiary of the Aegis Corporation. National Union Fire Insurance Company of Pittsburgh, Pennsylvania, provided liability insurance. The accident rendered Brousseau's vehicle a total loss. At the time of the accident, Brousseau was a second year medical student at L.S.U. Medical Center in New Orleans.

DENIAL OF NEW TRIAL
Brousseau contends the trial court committed error by not granting her a new trial on the issue of quantum. In the motion for new trial, she contended (1) the trial court "failed to properly weigh the psychological effects of the accident on Peggy Brousseau, as a medical student under severe academic pressure" and (2) she discovered "additional evidence, in that, plaintiff has undergone psychological testing and evaluation which indicates that the accident resulted in extreme anxiety which detrimentally affected plaintiff's grades and resulted in her dismissal from medical school" which deprived her of prospective earnings of $866,442.51.
In a judge trial, the granting of a new trial is peremptory only (1) when the judgment appears clearly contrary to the law and the evidence and (2) when a party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during trial. La.C.C.P. art. 1972. A party seeking a new trial on the ground of newly discovered evidence bears the burden of proving the following: (1) the evidence was discovered after the trial; (2) the evidence could not have been discovered prior to trial through the exercise of due diligence; and (3) the newly discovered evidence would tend to change the result of the first trial. Orlando v. Polito, 228 La. 846, 84 *449 So.2d 433 (1955); Succession of Budwah, 441 So.2d 39, 42 (La.App. 3rd Cir.1983); Baltzar v. Missouri Pacific Railroad, 406 So.2d 324 (La.App. 3rd Cir.1981); Cable v. Cazayou, 351 So.2d 797 (La.App. 1st Cir. 1977). Due diligence requires that a party do all that is reasonable to lead to the discovery of evidence. Barker v. Rust Engineering Company, 428 So.2d 391 (La. 1983). Otherwise, the granting of a new trial is within the discretion of the trial court. La.C.C.P. art. 1973; Charpentier v. Louisiana Land and Exploration Company, 415 So.2d 452 (La.App. 1st Cir.1982).
The trial court found as fact there was no causal nexus between the accident and Brousseau's dismissal from medical school. To determine if the trial court judgment is clearly contrary to the law and the evidence, we must review the evidence presented at the original trial; no new evidence is involved. Succession of Budwah, 441 So.2d at 42. The record herein is made up of testimony taken in court in the presence of the trial judge and depositions of witnesses taken out of his presence. In reviewing factual findings based on testimony adduced in open court, we must follow the clearly wrong (manifest error) standard of Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). When reviewing factual findings based on depositions, we must only determine the sufficiency and preponderance of the evidence. Hayes v. Commercial Union Assurance Company, 459 So.2d 1245 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1247 (La.1985).
Brousseau testified at trial she received a BS degree in medical technology from L.S.U. in 1974. She unsuccessfully applied for admission to the L.S.U. Medical School in 1975, 1976, 1977 and 1978. In 1977, she enrolled full time at L.S.U. and worked on a masters in genetics. She started L.S.U. Medical School in the fall of 1979. During her first year in medical school, she had bronchitis for a couple of months and could not dissect her cadaver very much because formaldehyde "strongly irritated" her by causing tearing and a rash. She also had problems with her teeth which caused her to have headaches. She failed neural science and had to make the class up in the summer of 1980. She commenced her second year in August of 1980. The accident occurred on September 5, 1980. She was able to go to class on September 8, 1980. She went to the L.S.U. Family Practice Center (Clinic) for the first time on September 18, 1980, for injuries she received in the accident. At that time, she saw Drs. Francis Nicolle and Sandra Dorsey. Her primary treating physician at the Clinic was Dr. Nicolle. In October of 1980, her back pain caused by the accident forced her to miss three days of class and a test. Brousseau testified her injuries from the accident impaired her ability to study and affected her concentration. She continued going to the Clinic in 1981 and also had physical therapy treatments. Ultimately, Brousseau failed pathology, pharmacology and ophthalmology and, thus, failed her second year in medical school. Brousseau testified the accident and its aftereffects caused academic problems and failure. She was required to repeat her second year during the 1981-1982 school term. During this year, she worked part-time as a medical technician at the Tulane Medical Center. Brousseau again failed pharmacology and was dismissed from the medical school. She returned to L.S.U. and continued work on her masters degree in genetics.
Dr. Caroline Battles testified at the trial she started medical school with Brousseau. In the fall of 1980, Brousseau told her about the accident. At a later date in either September or October, Brousseau called Battles and requested a ride to the Clinic. Battles went to Brousseau's room and observed Brousseau was "in a lot of pain", had difficulty standing up straight and had difficulty walking. Battles had to help Brousseau to the car and into the Clinic. At the Clinic, Brousseau received "a dose pack of steroids." When questioned about the causal relationship between the accident and Brousseau's academic performance in her second year, Battles gave the following testimony:

*450 Q. All right. Are you aware that her professors have indicated that they can not say one way or the other whether or not this accident had any effect on her course work in the courses that she had trouble with? Are you aware of that?
A. Well, I can see whatI'm not aware of that, but I can see what they're saying. I also have to say that it's possible. I'm not saying that definitely the accident caused her to fail, but I feel like I can say that it's very possible that it would have effected her performance. Now, I'm not saying pass or fail. I'm just saying it may have effected her performance. That's all I can say.
Q. Are you aware of any other students that did not pass during the course of their medical school career?
A. Ah-hum. Yes. I am.
Q. With reference to those students do you havewould you have to say the same thing, that you have no way of really knowing why they flunked out?
A. Well, there's no way that I can know why they flunked.
Q. The same way with Miss Brousseau; is that correct?
A. I guess I'd have to say that.
Dr. Henry Van Dyk testified by deposition that he taught the two week ophthalmology course that Brousseau failed. He was not aware that she was in an accident or had a medical problem due to a back injury.
Dr. Lester Vial, Jr. testified by deposition that he taught the pathology course Brousseau failed. He knew she had a back problem but could not recall if she told him about the automobile accident. Brousseau had a medical excuse to miss one of his examinations.
Dr. Lee R. Morgan testified by deposition that he was the head of the pharmacology department at the medical school. Brousseau was taught pharmacology by Dr. Marc Alderice, who was no longer at the school. He had no contact with Brousseau and first learned of her accident in a letter dated August 18, 1982, that she sent to him appealing her second failure of pharmacology.
Dr. Howard M. Randall testified by deposition that he was the Director of Student Affairs at the medical school. He met with Brousseau on seven occasions: September 30, 1980; May 25, 1981; June 12, 1981; March 4, 1982; April 23, 1982; June 2, 1982; and June 10, 1982. Brousseau told Dr. Randall of the accident at the September 30, 1980 meeting. Brousseau did not discuss the accident at the other meetings at which her academic problems were discussed. Brousseau was dismissed from the medical school on June 10, 1982.
Dr. Edna Doyle, a specialist in physical medicine and rehabilitation, testified by deposition she saw Brousseau three times between January 12, 1981, and February 2, 1981. Dr. Doyle diagnosed Brousseau's condition as either a minor intervertebral derangement or a facet joint strain. When questioned about Brousseau's ability to attend school, Dr. Doyle testified as follows:
Q Did you feel like, on both the first and second visits, that her condition was such that she would not be able to sit in class and attend school?
A No. No, thinking back, I don't think so. Her back seemed to be worse toward the end of the day when she had been sitting but I think she was able to keep up with classes.
....
Q And, here again, as of this visit, did you feel she could sit in her classes and attend her school work?
A Oh, yes.
Dr. Francis Nicolle testified by deposition that he saw Brousseau eleven times between September 18, 1980, and February 26, 1981. Dr. Nicolle diagnosed Brousseau's condition as a mild back strain and he did not restrict her activities at any time. Dr. Nicolle testified as follows:
Q. Based on your treatment of back strain cases such as this, in your opinion *451 could she have continued going to class and participating as a medical student during the period that you were treating her for her back strain
A. I feel she could.
Q. She could?
A. Could.
Q. And you have no record where you advised her not to do so?
A. No, sir.
In his oral reasons for judgment, the trial judge found "as a fact that her [Brousseau's] academic problems were not caused by the accident." This factual finding indicates that the trial judge, after he saw and heard Brousseau testify, rejected her contrary testimony and/or gave it no weight. This factual finding is supported by the testimony of Drs. Battles, Doyle and Nicolle. A review of all the evidence of record shows the trial judge was not clearly wrong in rejecting Brousseau's testimony and accepting Dr. Battles'. A preponderance of the evidence supports the testimony of Drs. Doyle and Nicolle. Accordingly, this factual ruling by the trial judge is not clearly contrary to the law and the evidence, and the motion for a new trial was properly denied on this ground.
Brousseau filed suit on August 25, 1981, and her petition, in pertinent part, alleges she "suffered excruciating mental anguish, which mental anguish has continued through this date and which mental anguish has caused nightmares, headaches, and such depression and anxiety that plaintiff is unable to normally function in her daily routine as a medical student." Brousseau was dismissed from medical school on June 10, 1982. On October 24, 1983, she filed a supplemental and amending petition alleging she "was dropped from the rolls of Louisiana State University Medical School because of her inability to properly perform her academic duties because of the injuries sustained in the accident" and increased her quantum claim from $452,000 to $5,452,000. The trial was held on November 3 and 8, 1983, and February 3, 1984. Judgment was rendered from the bench on February 3, 1984, and was read and signed on March 20, 1984.
The motion for new trial was filed on March 27, 1984, and was heard on May 18, 1984. The minute entry for the hearing shows the "matter was argued and submitted" and the trial court denied the motion "for oral reasons assigned". Filed in evidence[3] at the hearing was a psychological evaluation dated April 2, 1984, by Fred L. Tuton, a clinical psychologist. Tuton diagnosed Brousseau's condition as chronic post-traumatic stress disorder associated with a moderate depressive reaction and expressed the opinion that Brousseau's accident "resulted in her not being able to physically and emotionally perform academic requirements of medical school" and "caused her to be dropped from medical school".
The allegation in Brousseau's petition that the accident made her depressed and anguished to the point that she was "unable to normally function in her daily routine as a medical student" clearly puts the factual issue of the causal nexus between the accident and her school performance at issue. This petition was filed in August of 1981. In October of 1983 in her supplemental and amending petition, Brousseau specifically alleged the accident caused her dismissal from medical school. The trial of this case was not argued and submitted until February of 1984. The evidence provided by the psychologist was apparently secured between February 3 and March 27, 1984. The burden was on Brousseau to show this evidence could not have been discovered prior to the conclusion of the trial through the exercise of due diligence. No such showing has been made, and, thus, Brousseau has failed to meet the burden of proof required of her.
*452 Further, Brousseau, as an appellant, is responsible to designate an adequate record upon which we, as an appellate court, can adjudicate her assignment of error. The record herein does not contain a transcript of the hearing on the motion for new trial. When a record lacks a transcript, the inadequacy of the record is imputable to the appellant. In cases where factual issues are involved (such as whether or not there was due diligence) and the record contains no transcript, narrative of fact or other evidence, an appellate court will apply the presumption that the trial court's judgment is supported by competent evidence and will affirm the judgment. La.C.C.P. arts. 2130 and 2131; Ronald Adams Contractor, Inc. v. State, Department of Transportation and Development, 464 So.2d 1003 (La.App. 1st Cir.1985). Appellant's claim that she is entitled to a new trial on the ground of newly discovered evidence is without merit. Cf. Succession of Kennedy, 423 So.2d 76 (La.App. 1st Cir.1982).
A review of the record also shows the trial judge did not abuse his discretion in denying the motion for a new trial.
This assignment of error is without merit.

QUANTUM
Brousseau contends the general damage award of $6000 is inadequate.
The accident occurred on Friday, September 5, 1980, at approximately 8:30 p.m. Brousseau was visibly shaken and suffered a small cut on her left leg. However, she was not taken from the scene of the accident to the hospital for medical treatment. Later that same evening, her parents insisted she be examined and she was taken to the emergency room of the Lady of the Lake Medical Center in Baton Rouge. The examining physician found an abrasion of the left medial lower leg which was causing her pain in the posterior area and left foot. The physician noted on the emergency room report the following: chest clear, neck OK, belly benign, extremities OK.
Brousseau returned to New Orleans on Sunday and attended her classes on Monday, September 8, 1980. Brousseau's first visit to the Clinic was on September 18, 1980. Brousseau went to the Clinic to have her bruises verified for existence and documented by one of the doctors. The police report stated that she did not wear a seat belt, and Brousseau wanted to have that corrected by a doctor's examination of her bruises. On that first occasion, Brousseau saw a resident, Dr. Sandra Dorsey, and was also attended by Dr. Nicolle.
Brousseau returned to the Clinic on October 1, 1980. She was unable to see Dr. Dorsey and was examined by Dr. DePender. Brousseau stated that three days previously she began to have increased left lower back pain. The doctor observed the following: no paravertebral spasm, vertebrae were non-tender, slight lumbar tenderness, no CVA tenderness at the castro-vertebral angle. Her reflexes were full and symmetrical. The doctor recommended hot baths and showers.
Brousseau returned to the Clinic in October 13, 1980. She was examined by Dr. Nicolle who continued to treat her until February of 1981. Dr. Nicolle suggested exercise and prescribed Norflex. Also, X-rays were taken of the lower spine and physical therapy was discussed. Dr. Nicolle diagnosed her condition as mild back strain.
On her last visit to the Clinic on February 26, 1981, Dr. Nicolle found that Brousseau had full range of motion to the back and minimal tenderness over the sacroiliac area. During the entire period that Nicolle treated Brousseau, he at no time limited her activities.
When questioned at the deposition about Brousseau's condition at the first examination on January 12, 1981, Dr. Edna Doyle stated:
[T]here was tenderness over the thoracolumbar junction, facet joints, bilaterally, with dermatomal signs. That is, there was tenderness over the crest of the ilium. Tenderness over the lower abdominal *453 skin, the skin of the upper, inner thigh, and the pubic bone on that side was tender to palpation. She also had some tenderness in the mid thoracic region. There was no cervical problem. There was some tenderness over the upper lumbar joints, bilaterally. My impression was a minor intervertebral derangement or facet joint strain.
Dr. Doyle suggested moist heat, relaxation and physical therapy to Brousseau. The physical therapy was arranged by Dr. Doyle, and Brousseau attended six sessions which greatly improved her condition. February 2, 1981, was the last time that Dr. Doyle saw Brousseau. Dr. Doyle testified that she would have liked to have seen Brousseau on one more occasion but that her condition had been "definitely improving."
Brousseau only missed three days of class due to the accident, and her total medical bills were $303.63. She did, however, receive some of her medical treatment without charge. As previously indicated, the trial judge correctly found as fact that there was no causal nexus between the accident and Brousseau's academic deficiencies.
A trial court has much discretion in fixing damage awards and such awards will not be modified on appeal unless an abuse of discretion has been shown. La.C.C. art. 1934(3); Reck v. Stevens, 373 So.2d 498 (La.1979). After reviewing all pertinent quantum evidence, we conclude that the award of $6000 herein is not an abuse of discretion. Cf. McCoy v. Franklin Parish Police Jury, 414 So.2d 1369 (La.App. 2nd Cir.1982).
This assignment of error is without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Appellant is cast for the cost of this appeal.
AFFIRMED.
NOTES
[1] Made defendants in this suit were Robert W. Tucker, Long Mile Rubber Company, Aegis Corporation and National Union Fire Insurance Company of Pittsburgh, Pennsylvania. However, service was only requested on the insurer. Apparently, issue was never joined with Tucker, Long Mile and Aegis.
[2] On May 25, 1984, pursuant to court order, the insurer deposited (tendered) the full amount due on the judgment into the registry of the court.
[3] Alleged newly discovered evidence initially may be considered on a motion for new trial only as it is relevant to the issue of due diligence and to show that it would tend to change the result of the trial. However, until a new trial is granted, the alleged newly discovered evidence is not relevant to the merits of the case.